# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
*ex rel.* SALLY JO ROBINS and
KATHLEEN D. MARIE

      Plaintiffs-Relators,

v.

LINCARE, INC. and LINCARE
HOLDINGS, INC.,

      Defendants.

Civil Action No.:
1:12-CV-11707-DPW

## FIRST AMENDED COMPLAINT

Plaintiff, the United States of America *ex rel.* SallyJo Robins and Kathleen D.

Marie, alleges as its First Amended Complaint against Defendants Lincare Holdings

Inc. and Lincare Inc. (collectively, "Lincare") as follows:

## Introduction

1.     This is an action to recover damages, treble damages, and penalties on

behalf of the United States of America on account of false and fraudulent claims made

or caused to be made by Lincare, its agents, employees, and co-conspirators, in violation

of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended (the "Act").

These violations involve the intentional and systematic submission of false claims to the

United States of America, including several of its agencies and/or departments, for the purpose of getting payments in excess of those to which Lincare was lawfully entitled for oxygen and other respiratory equipment charges.

2.     In particular, Lincare falsely and fraudulently billed the government for services and equipment after it was required to cease billing for inactive customers and also did so in cases where Lincare knew the customer was not using the equipment. Lincare also improperly waived deductibles and co-pays and paid kickbacks to referral sources.  As a result of these knowingly false and fraudulent claims, Lincare received payments from the United States of America that were inflated, excessive, and unearned.

3.     The Act provides that any person who knowingly submits or causes to be submitted, or conspires to submit, a false or fraudulent claim to the United States of America for payment or approval is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim submitted or paid, plus three times the amount of damages sustained by the United States of America from the payment of such fraudulent claims.  The Act's *Qui Tam* provisions further allow any person having information regarding a false or fraudulent claim against the United States of America

- 2 -

to bring an action for herself (as the "relator") and for the United States of America, and to share in any recovery.

4.      Based on these provisions of the Act, SallyJo Robins and Kathleen D. Marie, as Plaintiffs/Relators, seek to recover damages, treble damages, and civil penalties arising from false claims made to the United States of America that were knowingly presented or caused to be presented to, and were paid by, the United States of America as a result of the acts of Lincare and its agents, employees, and co-conspirators.

5.      The frauds at issue here violate the Act both before and after its May 2009 amendments.

## Parties

6.      Plaintiff/Relator SallyJo Robins is and was, at all times relevant to this First Amended Complaint, a resident of Buffalo, New York.  Robins has personal knowledge of the facts alleged in this First Amended Complaint, unless stated otherwise, and is acquainted with Lincare and its business practices.

7.      Robins has been employed by Lincare for approximately 17 years at its Amherst, New York facility.  She is currently employed as a Direct Pay Accounts

Receivable Supervisor.  She also trains junior employees and was Relator Marie's supervisor when Marie was still employed at Lincare.  Robins has previously worked in the Medicare/Medicaid billings area.

8.      Plaintiff/Relator Kathleen Marie[1] is and was, at all times relevant to this First Amended Complaint, a resident of Tonawanda, New York.  Marie was a Lincare Direct Pay Patient Account Representative from 2003 to 2010, and she worked with Relator Robins in the Amherst, New York office.  Marie has personal knowledge of the facts alleged in this First Amended Complaint, unless stated otherwise, and is acquainted with Lincare and its business practices.  Marie was unlawfully terminated by Lincare in June 2010.

9.      Robins and Marie bring this action for violations of 31 U.S.C. sections 3729, *et seq.* on behalf of themselves and the United States of America pursuant to 31 U.S.C. section 3730(b)(1).  The allegations in this action are based upon their personal knowledge unless otherwise described as being made upon information and belief.

---

[1]      Subsequent to the filing of the initial Complaint in this matter, Kathleen Marie married and legally changed her name to Kathleen Dunlap.  For ease of reference, the First Amended Complaint will continue to refer to her as Kathleen Marie.

10.     Robins and Marie are the original sources of the factual allegations of this First Amended Complaint within the meaning of section 3730(e)(4)(B) of the Act.

11.     Upon information and belief, Lincare Holdings Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal office for the transaction of business located at 19387 U.S. 19 North, Clearwater, Florida, 33764.

12.     Upon information and belief, in July 2012, Lincare Holdings Inc. was acquired by The Linde Group.

13.     Upon information and belief, Lincare Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal office for the transaction of business located at 1490 North Belcher Road, Suite L, Clearwater, Florida 33765 and/or at 19387 U.S. 19 North, Clearwater, Florida, 33764.

14.     Upon information and belief, Lincare Inc. is a wholly-owned subsidiary of Lincare Holdings Inc.

15.     Upon information and belief, Lincare is a Medicare supplier that provides home health services across the country, including in Massachusetts and other parts of

New England, and Lincare has multiple full-time offices that conduct business in Massachusetts.

## Jurisdiction and Venue

16.     Upon information and belief, Lincare is doing business in this District and is subject to this Court's jurisdiction.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, both of which confer jurisdiction on this Court for actions brought under the Act.

18.     Upon information and belief, venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Lincare can be found and/or transacts business in Massachusetts.  Venue is also proper pursuant to 28 U.S.C. sections 1391(b) and (c).

## Procedural History

19.     Relators Robins and Marie initially filed this case against Lincare in the Western District of New York on August 24, 2009.

20.     Because a similar case was filed against Lincare in the District of Massachusetts, *see United States ex. rel. Lima, et al. v. Lincare, Inc.,* Civil Action No. 1:10-

12256-DPW (D. Mass. Filed Dec. 29, 2010), Relators Robins and Marie moved to have

this case transferred to this Court.  In September 2012, the case was transferred here.

## Allegations of Fact

21.     Medicare Part B, the Supplementary Medical Insurance Program, provides

coverage to eligible beneficiaries for reasonable and medically necessary durable

medical equipment, such as oxygen equipment and respiratory assistance devices.

22.     At all relevant times, Lincare was and is in the business of providing, for a

fee, oxygen and other respiratory therapy equipment and services to in-home patients

who suffer from various diseases requiring supplemental oxygen or other respiratory

therapy services.

23.     Specifically, Lincare provides the following products and services:  (a)

oxygen concentrators, which are stationary units that provide a continuous flow of

oxygen by filtering ordinary room air; (b) liquid oxygen systems, which are containers

of liquid oxygen, generally consisting of a stationary unit and a portable unit, and are

most commonly used by customers with significant ambulatory requirements; (c)

nebulizers, which provide aerosol therapy; and (d) other respiratory and ventilation

devices.

24.     Upon information and belief, Lincare is one of the nation's largest providers of oxygen and other respiratory therapy services to patients in the home.

25.     Upon information and belief, about 63% of Lincare's customers have primary coverage under Medicare Part B.  And, upon information and belief, Lincare generates over 60% of its revenues from Medicare and Medicaid payments.

26.     Upon information and belief, Lincare is organized by centers, areas and regions.  Each local office is considered a "service center" and approximately 8 to 10 service centers comprise an area.  Upon information and belief, Lincare services about 800,000 customers in 48 states from approximately 1,000 service centers.

27.     Upon information and belief, Lincare's service centers are typically staffed by a center manager, two customer service representatives, two or three service representatives (referred to as "Service Reps.," who are responsible for delivery, maintenance, and retrieval of equipment and delivery of disposables), a respiratory therapist, and a sales representative.

28.     Upon information and belief, when a physician refers a patient to one of Lincare's service centers, a Lincare customer representative obtains the necessary Medicare/Medicaid (or other insurance) information and coordinates the delivery of patient care.

- 8 -

29.      Upon information and belief, Lincare then delivers the prescribed therapy at the customer's home, and Lincare representatives provide customers with instruction and training regarding equipment use and maintenance as well as compliance with the prescribed therapy.

30.      Following the initial setup, Lincare's representatives are required to make periodic visits to the customer's home.

31.      Upon information and belief, Lincare carries on its sales activities via sales representatives who work out of its local service centers.  They are assisted by Lincare's center managers.

32.      Upon information and belief, Lincare primarily acquires new customers through referrals, and sources of referrals are physicians, hospital discharge planners, prepaid health plans, and clinical case managers.   Upon information and belief, Lincare's sales representatives maintain continual contact with these medical professionals.

33.       Lincare's service centers are supported by several dozen regional billing and collection offices, which perform Lincare's billing and reimbursement functions. Each billing office is responsible for service centers in several areas.

- 9 -

34.     Lincare electronically bills Medicare on a daily basis from Lincare's central computer system at its billing centers.  For various state Medicaid agencies and other payors that do not accept electronic billing, Lincare generates paper claims and invoices.

35.     Lincare also bills customers directly, as Medicare and most other government payors that provide coverage to Lincare's customers include a co-payment requirement and a deductible, both of which must generally be paid by the customer. Lincare typically does not collect co-payments at the time of service; rather, they are invoiced to the customer or applicable secondary payor (supplemental providers of insurance coverage) on a monthly billing cycle as equipment is provided.

36.     Relator Robins works in Lincare's Amherst, New York regional billing office, which is located at 20 Hazelwood Drive, Suite 112.  Relator Marie also worked at this office during the time she was employed by Lincare.

37.     Lincare's Amherst regional billing office is responsible for billing approximately $20-$30 million per year.  This office is responsible for the billings of numerous Lincare service centers located in New Jersey, Pennsylvania, Maryland, Delaware, and Virginia.

38.     Robins works in the billing office's "direct pay" unit (as did Marie when she was employed by Lincare), which processes billings to customers who are billed directly.  Their officemates bill Medicare, Tricare, Medicaid, and private insurance.

39.     Robins speaks with service center representatives on a daily basis in all of the states serviced by the Amherst billing office, and she also speaks with and observes her officemates who bill Medicare, Medicaid, and private insurance.  The same was true for Marie.  Through observations, investigations, past experience, and conversations, Robins and Marie have knowledge of Lincare's practices in this First Amended Complaint as they relate to government payors.

40.     In particular, Robins and Marie have uncovered several systemic billing frauds at Lincare.

41.     *First*, Lincare routinely bills government health benefits programs for equipment rental fees long after the Lincare service center receives notice that the equipment is no longer in use due to death, recovery, a move into a skilled nursing facility, non-use, or some other reason.

42.     Although Lincare's stated policy is to stop billing upon account inactivation, which is to be immediately triggered by a doctor's discontinuance order,

- 11 -

date of death, pick-up request, or other similar notification, this policy is routinely and

fraudulently ignored in practice.

43.     For the time period relevant to this First Amended Complaint, Lincare's

billing offices had to rely on its service centers to provide information as to when a

customer should be "inactivated" such that billing to the customer and to third-party

payors should stop.

44.     Specifically, during the time period relevant to this First Amended

Complaint, Lincare service center representatives, who work in the field, communicated

with the billing office about deliveries, equipment status, and customer inactivations by

using "tickets."

45.     In this way, the billing office learned about customers who died, left their

homes for hospitals or nursing homes, or otherwise ceased use and/or terminated

service.

46.     Lincare's service representative would fill out a ticket, in triplicate, stating,

for example, that a customer was to be inactivated, and would then forward the ticket

to his or her service center.  Sometime later, a copy of the ticket would make its way to

the relevant billing office (*i.e.* where bills are generated, typically at a geographically

different location) for data entry.  Information from the ticket would then be entered

into Lincare's computer system and, at the time of data entry — a.k.a. the "Batch date" — billing would be stopped for the customer.

47.     Lincare, however, encouraged and tolerated frequent lengthy lags between the date of the ticket discontinuing or inactivating a user and the date of billing cessation, leading to continued billing during periods of non-use and/or account inactivation.

48.     Upon information and belief, this occurred because Lincare had no procedures in place to ensure timely and correct communication of customer use information between its service centers and billing office.  In other words, there were no checks to make sure that service centers were sending tickets to the billing office on a timely basis.  Nor were there any procedures to ensure that Medicare or other payors were refunded for continued billing resulting from delays in communicating customer information.

49.     This problem was exacerbated because, upon information and belief, service center employees were (and continue to be) paid monthly and quarterly commissions based on the number of active customers they have.  Thus, many inactive customers were deliberately not reported to the billing centers as "inactive" until after the end of the month.

- 13 -

50.     Moreover, even after Lincare's billing centers received notice that a customer account was inactive through a notification from a service center, a customer or physician call, or a customer letter, Lincare, at least recklessly, continued to bill government health benefit programs long past the customer's inactive date and also failed to refund the government for any overpayments received.

51.     The following are some examples of this fraud:

- For its customer with initials RB, account No. 000-370-001 595, Lincare billed Medicare through December 2008 even though it picked up the customer's equipment in August 2008.

- For customer LC, account No. 041-730-000 050, Lincare billed Medicare through September 2008 even though it inactivated the account on July 31, 2008 because the customer's condition had improved.

- For customer HB, account No. 041-730-000-166, Lincare picked up the customer's equipment in April 2009, but billed Medicare until January 2010.

- Another example is customer ME, account No. 039-580-000 339, where Lincare picked-up the equipment on December 7, 2009 and inactivated the customer on that date, as well.  Lincare, however, billed Medicare on December 15, 2009, December 29, 2009, and January 29, 2010.

- Lincare customer WA, account No. 036-250-000 044, went into a nursing facility in April 2009.  Lincare, however, billed Medicare in May 2009, June 2009, July 2009, August 2009, September 2009, October 2009, November 2009, December 2009, January 2010 and February 2010.  The pick-up ticket for this customer's equipment is dated February 11, 2010.  Upon information and belief, because the customer was in a nursing facility on this date, this document was falsified by Lincare employees to cover up the overbilling.

- Lincare customer HL, account No. 372-682-439, began asking Lincare to pick up her nebulizer in January 2004.  Lincare, however, billed Medicare as late as August 2008, February 2009, and August 2009.

52.   These practices occurred on countless additional occasions.

- 15 -

53.     In or around November 2012, Lincare instituted a new computer system whereby service centers can now stop the billing for customers directly, instead of sending information to the billing office and having the billing office stop the billing.

54.     But, upon information and belief, service center employees continue to use incorrect dates with respect to the cessation of billing to ensure that they illegitimately receive higher bonuses and/or commissions.

55.     The *second* fraud involves Lincare's billing the government for oxygen concentrators that Lincare knows are sitting idle at its customers' homes.

56.     Specifically, Lincare frequently continues to bill government health benefit programs for idle oxygen concentrators that Lincare has discovered are getting zero hours of use.  In other words, Lincare learns that the customer is no longer using the equipment, but Lincare nevertheless continues to bill the government for it.

57.     Lincare learns of the non-use when its representatives periodically go to customers' homes to check on the concentrators — to check that they are functioning properly and to ensure their actual use.  At such time, Lincare representatives record the number of hours of use on the equipment's counter.

- 16 -

58.     In many instances, despite learning that the equipment is not being used during these "concentrator checks," Lincare continues to bill for the equipment.

59.     The following are examples of this fraud:

- Lincare billed Medicare for an oxygen concentrator for its customer with initials IA, account No. 025-270-000 983, from March 2007 through at least August 2008.  But between a September 2007 Lincare in-home concentrator check and one done again in June 2008, zero additional hours were logged by the concentrator's measuring device.

- Lincare billed Medicare for an oxygen concentrator for its customer with initials LS, account No. 010-410-001 033, from September 2006 through at least August 2008.  But between an April 2008 Lincare in-home concentrator check and one done again in August 2008, zero additional hours were logged by the concentrator's measuring device.  And, in fact, based on concentrator checks from January 2006 to May 2007, the customer used only 6 hours of oxygen in 2 years.  Such use is, upon information and belief, equivalent to non-use.

- 17 -

- Lincare billed Tricare for an oxygen concentrator for its customer with initials RD, account No. 013-790-003 428, from July 2007 through at least October 2008.  But between an August 2007 Lincare in-home concentrator check and ones done again in December 2007, March 2008, June 2008, and August 2008, zero additional hours were logged by the concentrator's measuring device.  In fact, in an October 2008 notation in the file, Lincare noted that "conc[entrator] check hours have not changed since 8-2007."

60.     These practices recurred on countless additional occasions.

61.     In many instances, Lincare's representatives have deliberately delayed picking up equipment not being used by the customer simply to enable further billings to be processed.

62.     Moreover, Lincare service representatives have asked billing personnel to allow billings to continue until month's end simply to enable the earning of additional commissions.

63.     Upon information and belief, the delay in picking up idle equipment and/or inactivating customers has led to Lincare billing Medicare and other third-party

payors, including Medicaid and Tricare, for equipment that was neither reasonable nor medically necessary for the customer.

64.     In recent history, Lincare representatives were required to review the equipment of 90% of their customers annually, which practice revealed numerous instances of idle equipment for which the government was continuously paying.

65.     Moreover, in some instances, Lincare representatives have falsified hours-of-use tallies to ensure that the fraudulent billing continues.

66.     For example, Lincare customer JM, account No. 035-960-000 211, told Lincare in November 2009 that he had not used the oxygen for 5 months, and concentrator check inquiries in February 2008 and December 2009 show the same number of hours of usage, demonstrating that the customer had not used the oxygen since, at least February 2008.  Despite the customer's non-usage from February 2008, Lincare billed Medicare in March 2008, April 2008, and June 2009.  Moreover, because oxygen levels can only go up or remain the same from month to month, the previous inquiry on October 15, 2007, showing hours of usage *higher* than those on the subsequent February 2008 check, is likely false and, therefore, the customer's non-usage likely started even before February 2008.

67.     In addition, Lincare routinely and recklessly bills the government for customers as to whom Lincare has not confirmed equipment usage.

68.     In one case, Lincare was unable to locate a customer (customer JG, account No. 018-820-000 564) since October 2008.  Lincare was, therefore, unable to confirm the customer's usage of the equipment.  Lincare, however, billed Medicare in November 2008, December 2008, January 2009, February 2009, March 2009, April 2009, and May 2009.

69.     The *third* fraud involves Lincare's practice of routinely waiving the Medicare deductible and co-pay.  In this way, Lincare retains more customers and, therefore, obtains greater revenues.

70.     Under 42 U.S.C. § 1320a-7a, any person who offers "remuneration" to a Medicare beneficiary, knowing that it is likely to influence the beneficiary to receive an item or service for which Medicare payment may be made from a particular supplier is subject to monetary penalties. "Remuneration" includes the waiver of coinsurance and deductible amounts unless the waiver is not offered as part of an advertisement or solicitation, the person does not routinely waive coinsurance or deductible amounts, and the person waives the amounts after determining in good faith that the individual

- 20 -

is in financial need or fails to collect the amounts after making reasonable collection efforts.

71.     In other words, Medicare deductibles are not routinely waivable, and such waivers are only permissible if Lincare determined in good faith that the individual is in financial need or failed to collect the amounts after making reasonable collection efforts.

72.     Routine waivers of co-pays are unlawful because the practice misrepresents Lincare's actual charge for the service at issue, which results in Medicare overpayments.  Lincare's own training manual recognizes the illegality because the practice causes overutilization of items and services paid for by the government.

73.     Regardless, upon information and belief, Lincare routinely waived and waives deductibles and co-pays without determining in good faith that a customer has a financial need and/or without making reasonable efforts to collect the amounts owed.

74.     In the Amherst office alone, Lincare has waived approximately $510,000 in co-pays and deductibles from June 2008 to June 2009.

75.     Robins' boss, Maureen White, has approved of Lincare's practice of waiving deductibles and co-pays without the proper financial hardship information.

76.     Moreover, upon information and belief, Lincare has no system in place to ensure that all similarly-situated customers who fail to pay co-pays or deductibles are treated similarly.  Lincare sends some customers to collection agencies, while it simply waives payments for others.

77.     The *fourth* fraud involves kickbacks to referring doctors and their families by way of Lincare providing them services and equipment free of charge.

78.     Lincare entered into a 2006 corporate integrity agreement with the Inspector General of the Department of Health and Human Services arising from alleged kickbacks to doctors for referrals.  But the practice continues.

79.     For example, Relators Robins and Marie discovered that Lincare provided free services to a doctor in New Jersey.  Handwritten notes at the bottom of the delivery ticket for this particular doctor state that "O2 will be free if we get O2 pts from office."

80.     Robins also discovered a number of kickbacks to facilities in the Baltimore area.

81.     Specifically, in December 2012, Relator Robins discovered that Lincare was providing free equipment to the Baltimore Washington Medical Center.  To fix this, Robins created an account for the facility and charged it for all the equipment it had

received from Lincare.  Then, Maureen White learned what Robins had done and directed Robins to reverse each of the charges to the facility.  Robins told Vanessa Hager, an Investigator in Lincare's Compliance Department, about the free equipment this facility was receiving.  Upon information and belief, the kickbacks continue.

82.     In another example, Robins learned that Lincare was not charging the Bravo Health Advanced Care Center in Baltimore for equipment.  Robins spoke with the Lincare service center employee servicing this facility, who told Robins that "we don't charge" this facility for equipment.  Based on the statements of the service center employee to Robins, this scheme to provide free equipment has been occurring since, at least, November 2012.

83.     Similarly, Robins learned that Lincare was not charging the Maria Healthcare Center in Baltimore for equipment when Robins came across pick-up tickets for this facility showing that equipment was picked up, but could find no record of Lincare ever delivering or billing the facility for any of the equipment it provided. Robins again informed Hager of this problem.  Upon information and belief, the kickbacks continue.

84.     Robins was also told by a service center employee in the Baltimore area that the center did not charge Stella Maris, a nursing facility in Lutherville, Maryland,

for press pads, nebulizers, and suction machines.  Robins informed Hager of this problem.  Upon information and belief, the kickbacks continue.

85.     Upon information and belief, the problem with Lincare providing kickbacks to medical facilities is widespread in the Baltimore area, involving additional facilities such as St. Joseph's Medical Center, Presbyterian Home, and Glen Meadows.

86.     The *fifth* fraud involves Lincare's failure to identify and repay overpayments received from the government.

87.     Lincare has the ability to run reports of its internal database that provide information about potential overbilling to government payors.  Lincare, however, does not run these reports on a regular basis and does not make any systematic attempt to ensure that overpayments are identified and repaid.  Instead, overpayments are identified – if at all – on an *ad hoc* basis resulting from an external event, such as a customer phone call or complaint.

88.     For example, Lincare's A/R Write-Off Report shows all recognized instances of Medicare or Medicaid overbilling for various reasons, including the fact that the customer was in a nursing home or hospital at the time of the bill, or there was a bill after the customer was inactivated, or there was a bill after the date when the

customer's equipment was capped (meaning that Lincare should have not have received payment for it).

89.     This report can be used by Lincare to isolate instances of overbilling third-party payors such that Lincare could refund any overpayments made.

90.     Lincare can also run a report called the Active Without Equipment report to identify customers who are active in the billing system (and, presumably, for whom Lincare is billing Medicare or another payor for these customers' equipment), but the customers do not, in fact, have any equipment.

91.     Lincare can use this report to isolate instances of billing third-party payors when the customer has no equipment.

92.     Another report that Lincare can run is called the Inactive With Equipment report, showing the dates of customer inactivation and the dates of equipment pick-up.

93.     By comparing the inactive date to the pick-up date, Lincare can identify instances where it has continued to bill Medicare and other payors for a customer's equipment when the equipment has already been picked-up.

94.     Despite having the capability, Lincare does not routinely run these reports to identify instances of overpayments received from the government and does not routinely refund such overpayments.

95.     Moreover, on a number of occasions, when several months of overbilling have been identified, instead of refunding the full overcharge, Lincare has refunded only a portion, *e.g.*, a month's overcharge.

96.     Lincare engages in all of the fraudulent acts set forth above knowing that it is billing the government for services and equipment for which Lincare is not entitled to be paid.

97.     Upon information and belief, these five types of frauds are occurring with tens of thousands of Lincare customers.

98.     These frauds also involve numerous occasions of Lincare's fraudulent retention of government money.

99.     The frauds discussed above involve, at least, Medicare, Medicaid, and Tricare — the military's health care plan.

100.    The specific examples of false claims set forth in this First Amended Complaint are illustrative — and not exhaustive — of the numerous similar false claims the Relators have discovered.

101.    The frauds in this First Amended Complaint are ongoing and have been occurring during all the years Robins and Marie have been employed at Lincare.

102.    Robins and Marie have repeatedly complained about all of these practices, to no avail.

103.    In addition, Robins and Marie have reported these frauds pursuant to Lincare's compliance policy, also to no avail.

104.    On one occasion in 2008, Robins wrote a letter to Maureen White, Lincare's Regional Billing Office Manager for the Amherst location, informing her of circumstances where Lincare billed during periods of non-use or after services were discontinued and suggesting improvements to Lincare's processes to prevent such circumstances.  These practices nevertheless continued and continue.

105.    Lincare ultimately fired Relator Marie – twice – for her frequent disclosures of the fraudulent practices occurring at Lincare.

- 27 -

106.    Specifically, on December 29, 2007, Lincare fired Relator Marie for the first time.  Upon information and belief, Lincare took this action in retaliation for Marie's bringing several frauds to the attention of Melissa Hite (now Gibson), a Lincare Compliance Officer located at its Clearwater, Florida headquarters.

107.    Upon information and belief, this termination was triggered by Marie's faxing of examples of the frauds described here to Gibson.  A few weeks after Marie's faxes, Maureen White, Lincare's Amherst, New York Regional Billing Manager, fired Marie.  In Marie's termination notice, White specifically references "a fax [that] was sent to the Compliance Department that was part of a file [Marie] ha[d] been holding on substandard workmanship and other issues with Center employees" as a basis for her termination.

108.    Phil Phenis, Lincare's National Reimbursement Manger, called Marie, apologized, and ultimately rehired her beginning in January 2008.

109.    After she was re-hired, Marie continued to report instances of fraud to Lincare's Compliance Department, both in connection with Lincare's required periodic compliance survey and on her own, apart from her normal job responsibilities, in an effort to identify and stop further violations of the Act.  Examples that Marie sent to Gibson included instances of Lincare billing Medicare after a patient's equipment was

picked-up; Lincare billing Medicare when the patient was in a nursing facility; and Lincare billing Medicare after a patient had requested a pick-up of equipment.

110.     Moreover, in 2009, Marie told Gibson that she received almost one call per day about instances of billing past a patient's inactivation date.  Marie said that she believed this was a company-wide problem.

111.     But employees in Lincare's Compliance Department were becoming increasingly frustrated at Marie's frequent disclosures and, in or around April 2010, they began telling her that she should limit the information she reported to examples of "intentional and malicious" overcharges to third-party payors, including the government.

112.     Specifically, on April 13, 2010, Marie met with Maureen White and Deb Dillon-Sara, a Lincare employee in the Compliance Department.  Dillon-Sara and White attempted to convince Marie that the examples she had been sending to the Compliance Department were simply innocent mistakes.

113.     Marie then had another meeting with Maureen White on April 14, 2010. She asked White if she should have sent the example of Lincare customer TM, account No. 004-430-003 898, to the Compliance Department.  TM involved a situation where the center manager asked Marie not to inactivate the customer because it would affect

the center manager's numbers.  White said that Marie should not have sent this example and, moreover, White said that Marie should never determine if accounts should be inactivated nor should she try to figure out if there is an overbilling.  White ended the meeting by saying that this job may not be for Marie.

114.    The next day, Marie had a phone call with Deb Dillon-Sarra, who said that, in the future, Marie should send only "intentional and malicious" errors to the Compliance Department.  When Marie brought up the TM example, Dillon-Sarra said that it should not have been sent to compliance because "that's heard all the time."  She also said that it is not Marie's place to decide whether an account should be inactivated.

115.    Then, on April 22, 2010, Marie attended a meeting with Relator Robins, White, and Jenna Pedersen, a Compliance Officer in Lincare's Compliance Department. The purpose of the meeting was to discuss Marie's frequent disclosures to the Compliance Department.

116.    During the meeting, Marie informed White and Pedersen that there was significant overbilling at Lincare, and she tried to explain that there were so many instances of billing problems that she did not know how she could appropriately limit the information she reported.

117.    Regardless, Pedersen and White told Marie that she was disclosing too many issues to the Compliance Department and, instead, she should bring any billing issues she encountered directly to White and Relator Robins.  White and Robins would then decide if the issue should be sent to the Compliance Department.

118.    On July 15, 2010, pursuant to the instructions given to Marie at the April 22 meeting and in a further effort to identify and stop violations of the Act, Marie went to White for the purpose of addressing specific examples of what Marie believed to be fraudulent activity at Lincare.

119.    White became extremely frustrated at Marie's request and refused to address the examples of overbilling that Marie had identified, saying only that they constituted "process issues," as opposed to "compliance issues."

120.    Marie again told White that overbilling was pervasive throughout the company and that employees were not being held accountable for their improper actions.  White, however, refused to listen to Marie and then terminated her.

121.    Upon information and belief, White terminated Marie in retaliation for continuing to identify and stop instances of Lincare's fraudulent billing of third-party payors, including the government, pursuant to the frauds identified above.

122.     After Marie was terminated, she informed Phil Phenis, Lincare's National Reimbursement Manager, that she had been terminated after trying to discuss instances of non-compliance and billing issues with White.  She also expressed to Phenis her frustration in coming across numerous instances of continuous overbilling of government agencies, private insurance, and patients.

123.     Phenis dismissed her concerns, telling Marie that she did not understand the "realities of how high volume operations like [Lincare's] in the billing centers or even in the [service] centers that everything doesn't run to perfection to meet what every policy would be."  He also acknowledged that, while Marie was trying to do the right thing, she was not "very flexible in [her] thoughts."  Phenis refused to reverse Marie's termination.

124.     Like Marie, Robins would routinely inform Lincare about flaws in the customer inactivation process.  She has disclosed to Lincare that she is "still seeing overbillings and/or situations that may expose [Lincare] to overbilling."

125.     In 2010, after Relator Marie was terminated, Vanessa Hager, Lincare's Compliance Investigator, asked Robins to send her examples of non-compliance as she came across them.

126.     In accordance with her instructions, Robins has sent numerous examples

of non-compliance to Hager, including instances of failing to inactivate a customer not

using the equipment and failing to inactivate a customer after the customer's equipment

was actually picked-up.  Upon information and belief, no remedial steps have been

taken to ameliorate these problems – on an individual or company-wide basis.

## Count I

### Substantive Violations of the False Claims Act
### [31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) (and predecessor versions of the Act)]

127.     Robins and Marie repeat and reallege each allegation of numbered

paragraphs 1 through 126 of this First Amended Complaint as part of this First Cause of

Action.

128.     As to each of the types of frauds explained above, Lincare, together with

its agents, employees, and co-conspirators, knowingly presented and/or caused to be

presented, to the United States of America and otherwise, false and fraudulent claims

for payment for oxygen and respiratory equipment for the purpose of getting such false

and fraudulent claims paid or approved by the United States.

129.     Lincare, as well, knowingly made, used, and/or caused to be made or

used false records and/or statements material to such fraudulent and false claims and

for the purpose of getting such false and fraudulent claims paid or approved by the United States.

130.    In addition, Lincare knowingly made, used, and/or caused to be made or used false records and/or statements material to an obligation to pay or transmit money or property to the United States and/or to conceal, avoid, or decrease an obligation to pay money to the United States.

131.    Lincare also knowingly concealed and/or knowingly and improperly avoided or decreased obligations to return money to the United States for its overcharges.

132.    As a result of the knowingly false and fraudulent claims submitted by Lincare, together with its agents, employees, and co-conspirators, the United States of America overpaid Lincare for oxygen and respiratory equipment.

133.    As a result of Lincare's knowing conduct and fraudulent overcharging, the United States of America has overpaid it substantial amounts of money, which total, at this time, is unknown but which can be expected to exceed tens of millions of dollars over the period relevant to this First Amended Complaint.

134.    As a result of the knowingly fraudulent conduct of Lincare, together with that of its respective agents, employees, and co-conspirators, Lincare is liable to the United States of America for the amount of the overpayments made to it, trebled, plus penalties, interest, and attorneys' fees under the Act.

## **Count II**

### **False Claims and Conspiracy**
### **[31 U.S.C. § 3729(a)(1)(C) (and predecessor versions of the Act)]**

135.    Robins and Marie repeat and reallege each allegation contained in paragraphs 1 through 134 of this First Amended Complaint as part of this Second Cause of Action.

136.    During the last several years, Lincare and its employees knowingly conspired among themselves and with others, including Lincare's employees and agents, to defraud the United States of America by presenting or causing to be presented false and fraudulent claims for the purpose of obtaining payment from the United States to which they were not entitled.

137.    Moreover, Lincare and its employees knowingly conspired among themselves and with others, including Lincare's employees and agents, to defraud the

- 35 -

United States of America by concealing and avoiding obligations to repay the United States for monies paid by the United States to Lincare to which Lincare was not entitled.

138.    In furtherance of the conspiracy, Lincare created records and documents substantiating and concealing their overbilling, knowing that information to be false and untrue, with the intent to defraud the United States of America.

139.    Based upon the false and fraudulent claims submitted by Lincare, the United States of America paid Lincare in excess of what it was entitled to receive for the services it provided.

140.    As a result, the United States of America has sustained substantial damages directly related to overpayments made to Lincare based upon false and fraudulent claims, and Lincare is therefore liable to the United States of America for the amount of such overpayments trebled, together with penalties, interest, and the costs of this action, including attorneys' fees, as provided for by the Act.

## Count III

**Retaliation**
**[31 U.S.C. §§ 3730(h) (and predecessor versions of the Act)]**

141.    Marie repeats and realleges each allegation contained in paragraphs 1 through 140 of this First Amended Complaint as part of this Third Cause of Action.

142.    Marie was an employee at Lincare, and she engaged in protected conduct under the Act, namely, the identification of false claims and efforts to expose and stop fraudulent conduct occurring at Lincare, as described above.

143.    Lincare knew of Marie's protected conduct through her frequent reporting of fraudulent activity to her supervisors and directly to Lincare's Compliance Department – actions that were above and beyond the normal job responsibilities of a Direct Pay Patient Account Representative, which was Marie's position when she was employed by Lincare.

144.    Lincare terminated Marie in retaliation for engaging in the protected conduct.

145.    As such, Marie is entitled to all of the relief available from Lincare, under Section 3730(h) of the Act, on account of its retaliation against her.

## **Jury Demand**

Robins and Marie demand a jury on all issues and matters triable by a jury under this First Amended Complaint.

## **Relief Requested**

WHEREFORE, the United States of America *ex rel*. SallyJo Robins and Kathleen

D. Marie demands judgment against Lincare as follows:

a)       On the first cause of action, for treble damages under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) (and predecessor versions of the Act) in an amount to be determined at trial, plus penalties, costs, interest, and attorneys' fees;

b)       On the second cause of action, for treble damages under 31 U.S.C. § 3729(a)(1)(C) (and predecessor versions of the Act) in an amount to be determined at trial, plus penalties, costs, interest, and attorneys' fees;

c)       On the first and second causes of action, for the damages sustained by the United States of America;

d)       On the third cause of action, on behalf of Relator Marie, reinstatement, double backpay, including interest on the back pay, and compensation for special damages, including litigation costs and reasonable attorneys' fees; and

e)       For award of such other and further relief as this Court deems proper as a matter of law or under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

                                        Respectfully Submitted,
                                        SallyJo Robins and Kathleen D. Marie
                                        By their attorneys,


                                        /s/  Michael Tabb
                                        _____
                                        Michael Tabb, Esq. (BBO #491310)
Dated: May 20, 2013                     matabb@greenellp.com
                                        GREENE LLP
                                        One Liberty Square, Suite 1200
                                        Boston, MA 02109
                                         (617) 261-0040

                                        and


                                        /s/  Daniel C. Oliverio
                                        _____
                                        Daniel C. Oliverio, Esq.
                                        doliverio@hodgsonruss.com
                                        John L. Sinatra, Jr., Esq.
                                        jsinatra@hodgsonruss.com
                                        Reetuparna Dutta, Esq.
                                        rdutta@hodgsonruss.com
                                        **HODGSON RUSS LLP**
                                        140 Pearl Street, Suite 100
                                        Buffalo, New York 14202-4040
                                         (716) 856-4000


                         <u>**CERTIFICATE OF SERVICE**</u>

        I, Michael Tabb, hereby certify that the Amended Complaint, filed through the
ECF system, was sent electronically to registered participants as identified on the Notice
of Electronic Filing (NEF) on May 20, 2013.

Date:  May 20, 2013                          /s/  Michael Tabb
                                             Michael Tabb


                                     - 39 -